# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim  No. 96-00085-04-CR-W-FJG |
| | ) | |
| BRYAN E. SHEPPARD, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

## I. BACKGROUND

Bryan E. Sheppard is currently serving a life sentence without the possibility of parole. On February 26, 1997, Sheppard, along with four other individuals was convicted of aiding and abetting an act of arson which resulted in the deaths of six Kansas City, Missouri firefighters. Sheppard's sentence was imposed on July 2, 1997. Sheppard appealed his sentence to the Eighth Circuit, which affirmed his conviction on October 30, 1998. Sheppard filed a petition for a writ of certiorari in the United States Supreme Court which was denied on October 4, 1999.  Sheppard filed his first 28 U.S.C. § 2255 motion on September 28, 2000. That motion was denied on July 11, 2003.  Sheppard appealed, but the Eighth Circuit denied the appeal on February 27, 2004.

Fifteen years after Bryan Sheppard was sentenced, on June 25, 2012, the Supreme Court issued its decision in Miller v. Alabama, 567 U.S. 460,132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012), holding that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's

prohibition on 'cruel and unusual punishments.'" On September 9, 2013, the Eighth

Circuit authorized Sheppard to file a successive habeas petition based on this decision.

Sheppard was born on March 5, 1971, and was 17 years and 8 months old, on

November 29, 1988, the date of the offense. On August 25, 2014, the Court granted

Sheppard's Amended Motion to Vacate, Set Aside or Correct Sentence.  After the Court

granted the §2255 motion, the Supreme Court granted certiorari on the question

whether  Miller v. Alabama applied retroactively. On January 25, 2016, the Supreme

Court issued its decision in Montgomery v. Louisiana, 577 U.S. __,136 S.Ct. 718, 193

L.Ed.2d 599 (2016) holding that "Miller announced a substantive rule that is retroactive

in cases on collateral review." Id. at 732.  A resentencing hearing was held on February

15, 2017.  The Court heard testimony from three family members of the firefighters who

were killed during the explosion, testimony from Bryan Sheppard, his family and friends

regarding his efforts over the years at rehabilitation, testimony from expert witnesses

regarding Sheppard's background and mental state as a teenager and also Sheppard's

amenability to rehabilitation as an adult. The Court now issues its decision after

consideration of the Miller factors and the 18 U.S.C. §3553 factors.

## II.  DISCUSSION

### A.  Evolving State of the Law

Because so much time has elapsed since the explosion and the trial, the Court

finds it helpful to briefly review the law regarding juvenile sentencing and how it has

changed over the years and how this impacts Bryan Sheppard's resentencing.

In 1950, Congress passed the Federal Youth Corrections Act ("FYCA").  This

was an alternative sentencing system for juveniles, which focused on treatment and

rehabilitation of juveniles.  In 1984, the FYCA was repealed with the passage of the

Comprehensive Crime Control Act. One commentator has noted:

> The mid-1980s and 1990s ushered in even coarser treatment of youth
> due to the rise in popularity of the myth of the juvenile "superpredator,"
> purportedly radically impulsive, brutally remorseless youngsters, including
> ever more pre-teenage boys, who murder, assault, rape, rob, burglarize,
> deal deadly drugs, join gun-toting gangs and create serious communal
> disorders. Though the pundits who spun these theories turned out to be
> wrong about the future of crime, cultural lore around the superpredator
> claim contributed to Congress enacting and President Clinton signing the
> Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA).
> Among other things, the VCCLEA authorized the federal prosecution of
> juveniles as adults for certain crimes of violence and increased penalties
> for juveniles in possession of a handgun or ammunition.

Note, Mending the Federal Sentencing Guidelines  Approach to Consideration of

Juvenile Status, 130 Harv.L.Rev. 994, 1002 (2017)(internal quotations omitted).

In Thompson v. Oklahoma, 487 U.S. 815, 838 108 S.Ct. 2687, 2700, 101

L.Ed.2d 702 (1988), a plurality of the Court found that the Eighth and Fourteenth

Amendments prohibited the execution of a person who was under the age of 16 at the

time of the offense.  However, just a year later in Stanford v. Kentucky, 492 U.S. 361,

109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the Court stated that it "discern[ed] neither a

historical nor a modern societal consensus forbidding the imposition of capital

punishment on any person who murders at 16 or 17 years of age."  The Court

determined that capital punishment of those 16 and over did not violate the Eighth

Amendment's prohibition of cruel and unusual punishment.  One commentator noted

that "Stanford was decided during the rise in the tough-on-crime attitude. Thus, the

majority's determination about the imposition of the death penalty on youth mirrored the

nation's trend toward crime-centric punishment instead of sentences that accounted for

an offender's characteristics." Elizabeth Hilliard,  Note & Comment,  A Life  Without:

Juveniles Spending Their Lives in Oregon's Prisons and the Need for Change Following Miller and Graham, 20 Lewis & Clark L.Rev. 333, 356 (2016).

In 1997, when Bryan Sheppard was originally sentenced, the sentencing guidelines were mandatory. The original Presentence Investigation Report stated that the sentencing guideline for a violation of 18 U.S.C. §844 (i) was found in 2K1.4. According to 2K1.4, the base offense level is applied unless death resulted. The Probation Office determined that the guideline for first degree murder under 2A1.1 was the most analogous for the following reasons:

> According to the evidence at trial, Sheppard went to the location of the highway construction project to burglarize the construction trailers in order to steal tools from the machinery. In the process of committing this offense, he assisted in setting fire to one of the construction trailers, which contained explosive materials. As a direct and proximate result of his contributory actions in setting the fire, an explosion resulted which caused death to the six firefighters who were attempting to extinguish the construction trailer fire in furtherance of their official duties. Therefore, because the death of the firefighters resulted during Sheppard's aiding and abetting in the burglary and arson at the construction site, the guideline for first degree murder under 2A1.1 applies and requires a base offense level of 43.

(Pre-Sentence Investigation Report, pp. 9-10). This resulted in a sentencing range of life in prison without the possibility of parole. However, in the almost twenty years since Sheppard's sentence was imposed, the Supreme Court has issued numerous opinions regarding the sentencing of juveniles. A brief summary of these opinions provides a historical context and explanation for the factors which courts now consider in sentencing juveniles.

In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Court reconsidered the question whether the Constitution bars capital punishment for

juvenile offenders who were older than 15, but younger than 18 when they committed

their crimes. The Court began by noting:

> The prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework we have established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual. Trop v. Dulles, 356 U.S. 86,
> 100-101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)(plurality opinion).

Roper, 543 U.S. at 560-61. The Court in Roper found:

> objective indicia of consensus in this case – the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice – provide sufficient evidence that today our society views juveniles, in the words Atkins [v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)] used respecting the mentally retarded, as "categorically less culpable than the average criminal." 536 U.S., at 316, 122 S.Ct. 2242.

Id. at 567.

The evolution of juvenile sentencing continued with the Supreme Court's decision

in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), where the

Supreme Court held that mandatory life without parole sentences violated the Eighth

Amendment when imposed on juvenile non-homicide offenders. In discussing the

Eighth Amendment, the Court stated:

> To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to "'the evolving standards of decency that mark the progress of a maturing society.'" Estelle v. Gamble, 429 U.S. 97,102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)(quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)(plurality opinion)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society

5

change.'" <u>Kennedy v. Louisiana</u>, 554 U.S. 407, 419, 128 S.Ct. 2641, 2649, 171 L.Ed.2d 525 (2008)(quoting <u>Furman v. Georgia</u>, 408 U.S. 238, 382, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)(Burger, C.J., dissenting)).

<u>Id</u>. at 58. The Court in <u>Graham</u> noted that "[n]o recent data provide reason to reconsider the Court's observations in <u>Roper</u> about the nature of juveniles. . . . developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." <u>Id</u>. at 68. The Court in <u>Graham</u> concluded that "a categorical rule gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential." <u>Id</u>. at 79.

Two years after <u>Graham</u>, the Supreme Court held in <u>Miller v. Alabama</u>, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), that mandatory life imprisonment without the possibility of parole for those under the age of 18 at the time of their offense, violates the Eighth Amendment. The Court in <u>Miller</u> stated:

> As we noted the last time we considered life-without-parole sentences imposed on juveniles, "[t]he concept of proportionality is central to the Eighth Amendment." <u>Graham</u>, 560 U.S., at __, 130 S.Ct., at 2021. And we view that concept less through a historical prism than according to "'the evolving standards of decency that mark the progress of a maturing society.'" <u>Estelle v. Gamble</u>, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)(quoting <u>Trop v. Dulles</u>, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)(plurality opinion)).

<u>Id</u>. at 2463. The Court in <u>Miller</u> explained that the previous decisions in <u>Roper</u> and <u>Graham</u> found that "children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most severe punishments.'

Graham, 560 U.S. at __, 130 S.Ct., at 2026." Id.at 2464.  There were three significant

differences between juveniles and adults the Court noted:

> First, children have a "'lack of maturity and an underdeveloped sense of
> responsibility,'" leading to recklessness, impulsivity, and heedless risk-
> taking.  Roper, 543 U.S. , at 569, 125 S.Ct. 1183. Second, children "are
> more vulnerable . . .to negative influences and outside pressures,"
> including from their family and peers; they have limited "control[l] over their
> own environment" and lack the ability to extricate themselves from horrific,
> crime-producing settings. Ibid.  And third, a child's character is not as "well
> formed" as an adult's; his traits are "less fixed" and his actions less likely
> to be "evidence of irretrievabl[e] deprav[ity]." Id. at 570, 125 S.Ct. 1183.

Id. at 2464. The  Court in Miller continued:

> Mandatory life without parole for a juvenile precludes consideration of his
> chronological age and its hallmark features – among them, immaturity,
> impetuosity, and failure to appreciate risks and consequences. It prevents
> taking into account the family and home environment that surrounds him –
> and from which he cannot usually extricate himself – no matter how brutal
> or dysfunctional. It neglects the circumstances of the homicide offense,
> including the extent of his participation in the conduct and the way familial
> and peer pressures may have affected him. . . .And finally, this mandatory
> punishment disregards the possibility of rehabilitation even when the
> circumstances most suggest it.

Id. at 2468.

After Miller was decided, questions arose regarding whether it applied

retroactively to cases on collateral review.  In Montgomery v. Louisiana, 136 S.Ct. 718,

193 L.Ed.2d 599 (2016), the Court stated:

> Because Miller determined that sentencing a child to life without parole is
> excessive for all but "'the rare juvenile offender whose crime reflects
> irreparable corruption,'"  567 U.S. at __, 132 S.Ct. at 2469 (quoting Roper,
> supra, at 573, 125 S.Ct. 1183), it rendered life without parole an
> unconstitutional penalty for "a class of defendants because of their status"
> – that is, juvenile offenders whose crimes reflect the transient immaturity
> of youth.  Penry, 492 U.S., at 330, 109 S.Ct. 2934. As a result, Miller
> announced a substantive rule of constitutional law. Like other substantive
> rules, Miller is retroactive because it "'necessarily carr[ies] a significant risk
> that a defendant'" – here, the vast majority of juvenile offenders – "'faces a
> punishment that the law cannot impose upon him.'" Schriro [v. Summerlin],

542 U.S., at 352, 124 S.Ct. 2519 (quoting <u>Bousley v. United States</u>, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)).

<u>Id</u>. at 734.

A review of the cases discussed above aids in understanding how the law has changed regarding juvenile sentencing in the years since Bryan Sheppard was sentenced to life imprisonment without the possibility of parole. The Supreme Court has now stated that it is unconstitutional to apply such a sentence without a consideration of Sheppard's age and other mitigating factors.  The Court now proceeds to discuss those factors announced in <u>Miller</u> and determine how they impact Sheppard's sentence.

## B. <u>Miller Sentencing Factors</u>

### 1. Circumstances of the Offense

Defendants Frank and Earl "Skip" Sheppard are brothers. Darlene M. Edwards was the live-in paramour of Frank Sheppard. Bryan Sheppard is the nephew of Frank and "Skip," and Richard Brown was Bryan Sheppard's best friend. In 1988, all of the defendants lived in the Marlborough neighborhood of Kansas City, Missouri. This neighborhood is located in the southeast portion of the city and was located near a highway construction project. In 1988, none of the . . . defendants were lawfully employed. Their primary means of subsistence was to steal things in order to buy drugs and alcohol. The thefts included residential and commercial burglaries as well as thefts from construction sites.

In late November 1988, the defendants agreed and planned together that they would steal items from a highway construction site located near their homes in the Marlborough neighborhood. In the early morning hours of November 29, 1988, the defendants traveled in several vehicles to the construction site. There, the defendants attempted to steal tools from the machinery and from one of two sealed construction trailers. On the site, two trailers contained approximately 25,000 and 30,000 pounds of ANFO, a mixture of fertilizer and diesel fuel used in the construction project for blasting through rock. The defendants set fire to one of these trailers in an effort to destroy evidence of their theft. The defendants also set fire to a security guard's unoccupied pickup truck located on the other side of the construction site.

8

That same night, at approximately 3:42 a.m., Pumper 41 arrived at the security guard's pickup truck and began the suppression of the trailer fires. At approximately 3:50 a.m. Pumper 30 arrived at the construction site and traveled up to a raised plateau to begin suppression of the fire at the trailer containing the blasting agents. At approximately 3:59 a.m. Pumper 41 joined Pumper 30 at the trailer fire on a hill of the construction site.

At approximately 4:06 a.m. the construction storage trailer containing 25,000 pounds of ANFO detonated as a result of the fire. The explosion resulted in the instantaneous death of six Kansas City, Missouri, firefighters who were near the trailer attempting to suppress the fire. Captain Gerald Halloran, Captain James H. Kilventon, and firefighters Robert D. McKarnin, Thomas Fry, Luther Eugene Hurd, and Michael R. Oldham were killed by the explosion. At 4:48 a.m., the second trailer located on the construction site, containing approximately 30,000 pounds of blasting agents, detonated as a result of the fire spreading from the first trailer. No one was injured in the second blast because the area had been previously secured by the police department.

(Pre-Sentence Investigation Report, pp. 4-5).

It is also of note that although the explosion occurred in November 1988, the defendants were not indicted until June 1996, almost eight years later. On February 26, 1997, the jury convicted all five defendants of aiding and abetting an act of arson to property used in interstate commerce thereby causing death to public safety officers performing official duties. The next day all of the defendants entered a waiver of their right to have a jury make a recommendation regarding sentencing and opted for sentencing by the Court.

In denying the defendants' Motions for New Trial, the Court stated:

The Court recognizes that the evidence in this case was not strong. There were two fires set on November 29, 1988, only one of which was charged in this case. No physical evidence linked any specific defendant to the scene, and there were no eyewitnesses to the offense. Rather, the government's case was built primarily around Darlene Edwards' confession, and numerous admissions against interest, referred to throughout the trial as "confessions," made by other defendants to various testifying witnesses. Many of these confessions required redaction, and many were inconsistent in their explanation of various details. Further,

9

while witnesses testified that each defendant confessed to being part of a group present at the setting of a fire, it was not clear from the confessions that all defendants knowingly participated in the actual setting of the fire which resulted in the explosion, as opposed to the allegedly initial fire of a security guard's truck, and the extent of various defendants' participation, except Darlene Edwards, was left largely undefined.

(Doc. # 348, pp. 6-7).

During the original sentencing hearing, counsel for the defendants argued to the Court regarding foreseeability and reminded the Court that a witness from the Bureau of ATF testified during trial that he was not aware of any instance in the history of the United States where a trailer loaded with ammonium nitrate and fuel oil had caught fire and exploded. (Doc. # 416, pp. 205-06). Counsel argued that this showed that the defendants could not have foreseen that setting fire to the tractor trailer would cause an explosion.

During the sentencing hearing, the Court stated:

We have now, however, reached this point at which the final judgment must be determined and announced. I do not believe, as Mr. Osgood has announced to all of you, I announced to him during the trial, that these five men intentionally and with malice and forethought went out to kill six Kansas City firefighters. I do believe that they conducted themselves in such a way and committed such act as to clearly and irretrievably make them fall under the statute which prohibited that conduct and set the penalty for it. That is the reason I announced what I announced today about the sentencing level. And that is the reason I announce at this time, as almost all counsel have anticipated, that each of the defendants; George Frank Sheppard, Earl D. Sheppard, Darlene Edwards, Bryan Sheppard and Richard W. Brown, is sentenced pursuant to the Sentencing Reform Act of 1984 to commitment to the custody of the Bureau of Prisons, to be imprisoned for a term of his or her natural life on this conviction on this one count indictment.

(Doc. # 435, pp. 115-116).

When preparing the initial Pre-Sentence Investigation report, the Probation Office requested that Dr. Richard Gist, a consulting community psychologist for the Kansas City, Missouri Fire Department provide a written statement regarding the impact of this explosion. The Pre-Sentence Investigation report states: "According to Dr. Gist, the above tragedy was the single worst structural firefighting tragedy in the living memory for this area and stands among the gravest on record for the modern U.S. fire service. Its impact on the families of the firefighters, the Kansas City, Missouri Fire Department; and the Kansas City community has been profound and the passing of nearly a decade has done little to lessen the pain of such a needless loss." (Pre-Sentence Investigation Report, p. 5).

There was compelling and moving testimony presented at the Resentencing hearing from Debbie and Cassie McKarnin, the wife and daughter of Robert McKarnin. Cassie McKarnin testified that "[t]he impact of this crime lingers though my entire lifetime and the entire lifetimes of everyone who loved those six men." (ReSentencing Transcript, p. 12). Janice Offill also testified regarding the effect of losing her brother Michael Oldham has had on her and her family.

There is no denying that the crime which the defendants were convicted of resulted in a tragic loss of six lives. However, the Court also cannot ignore the statements made by the trial judge, that he did not believe that the defendants intentionally with malice and forethought set out to kill the firefighters. The Court also cannot ignore that the evidence showed that the defendants went to the construction site that night to steal and that the fire was set merely to cover up or destroy evidence of their theft. There was no evidence that the defendants set the fire with the purpose of

luring the firefighters to the scene with the thought that they would be killed when the trailers exploded. Indeed, there was no evidence that it was forseeable that the trailers would explode. The AFT expert testified at the trial that he was not aware of any other instances in the United States where a trailer containing ANFO caught fire and exploded, so it was unlikely that the defendants knew when they set the fire that it would cause an explosion.

In Miller, Justice Stephen Breyer stated in his concurrence:

> I recognize that in the context of felony-murder cases, the question of intent is a complicated one. The felony-murder doctrine traditionally attributes death caused in the course of a felony to all participants who intended to commit the felony, regardless of whether they killed or intended to kill. See 2 W. LaFave, Substantive Criminal Law §§ 14.5(a) and (c) (2d ed. 2003). This rule has been based on the idea of "transferred intent"; the defendant's intent to commit the felony satisfies the intent to kill required for murder. . . .But in my opinion, this type of "transferred intent" is not sufficient to satisfy the intent to murder that could subject a juvenile to a sentence of life without parole.
> . . .
>
> At base, the theory of transferring a defendant's intent is premised on the idea that one engaged in a dangerous felony should understand the risk that the victim of the felony could be killed, even by a confederate. See 2 LaFave, supra, § 14.5(c). Yet the ability to consider the full consequences of a course of action and to adjust one's conduct accordingly is precisely what we know juveniles lack capacity to do effectively.

Id. at 2476.

The Court concludes that the circumstances of the offense dictate that a sentence of less than life in prison without the possibility of parole should be imposed on Bryan Sheppard.

## 2. Character and Record of Offender

When Bryan Sheppard was 17, he was charged with stealing a bicycle. He pled guilty and was granted a suspended imposition of sentence, but he violated his

probation and was ordered to serve ninety days in jail.  When he was 18, Bryan was charged with driving on a suspended license, careless and heedless driving and resisting arrest.  When he was 19, he was charged with resisting arrest and being a minor in possession of alcohol.  At age 20, he was charged with disorderly conduct and obstructing legal process.  At age 21, he was charged with driving while under the influence, careless driving and driving with a suspended license. He was also charged with simple assault and larceny under $200.  At age 22, he was charged with driving with a suspended license, improper registration, defective equipment and failure to provide insurance. He was also charged with burglary.  At age 23, he was charged with giving false information to a police officer and possession drug paraphernalia and methamphetamine.  At age 24, he was charged with distributing, delivering and manufacturing a controlled substance.  Bryan pled guilty to three counts of selling methamphetamine and on July 15, 1996 he was sentenced to 7 years custody with the Missouri Department of Corrections.

Dr. Lori Sexton, Assistant Professor of Criminal Justice and Criminology at the University of Missouri-Kansas City testified that Bryan Sheppard's adjustment to prison has been "quite remarkable."  In her report Dr. Sexton stated that Bryan has "made the difficult choice to follow the rules, be a good citizen, and take advantage of the opportunities afforded to him; his favorable institutional record, with only ten minor disciplinary infractions over two decades, demonstrates this. (Resentencing Exhibit 5, p. 2). Since 1988, Bryan Sheppard has completed numerous programs and certificates including computer classes, anger management, drug education, competing in Native American Spirit Runs, Twelve Step Support Group, the Challenge Program and

obtaining his GED. (Second Addendum to the Pre-Sentence Report, pp. 3-5). The Court finds that the relatively few criminal convictions Bryan had before being convicted of the instant offense and Bryan's record of good conduct while in prison demonstrate that he falls with the category of "the juvenile offender whose crime reflects unfortunate yet transient immaturity" and does not indicate that he is the "rare juvenile offender whose crime reflects irreparable corruption. [Roper, 543 U.S.] at 573, 125 S.Ct. 1183." Graham, 560 U.S. at 68, 130 S.Ct. at 2026. This factor thus also weights in favor of a sentence less than life in prison.

### 3. Background Mental & Emotional Development of Defendant

Dr. Marilyn Hutchinson, a licensed psychologist, conducted a psychological evaluation of Bryan Sheppard in preparation for the resentencing hearing. Dr. Hutchinson stated in her report:

> The Marlboro neighborhood in Eastern Jackson County was populated by working class families who worked hard, and played hard. The norm was for parents to gather and drink and smoke and the children were parented by "the village." . . .The neighborhood normalized the consumption of alcohol and marijuana and Mr. Sheppard received both from his mother under the age of ten. . . .Bryan Sheppard was raised and lived in a close knit community in which his parents and grandparents had lived since the 1950's. His uncle had been shot and killed shortly after he was born. Another uncle had nearly died as a result of reckless behavior. His uncle Frank had been to prison where young Bryan was taken to visit him. His uncles were notorious in the community. They were "Indians" who stole from stores; who got in bar fights; were kicked out of nearly every bar; were hit by cars; and who, on occasion, beat their nephew [Bryan].

(Report of Dr. Hutchinson, Resentencing Ex. 8, p.5).

> Mr. Sheppard's immature brain was evident in almost all of his daily actions. His lack of impulse control and failure to predict consequences is perhaps best seen in his reckless and daring behavior. He loved speed – on his bike or in a car. He drove fast; he jumped bikes off Cement Mountains, and jumped hills on his bike, often crashing. His lack of planning was shown in his perpetual focus on how to have a good time as

14

his highest priority, dating multiple girls at once and having two carry a child at the same time. He had complete denial that his current life style could carry him forward to any life he would want to have. The next twenty-four hours was the span of his attention.

The future was not a real factor in his day to day life; he moved from house to house, slept in a tent one summer, partied whenever possible, worked minimum wage jobs, and drank and smoked despite having clear examples of the consequences those same behaviors had had for many friends, neighbors and family members.

This life style (as well as ADD and learning problems) led to many problems in school. While he missed many days of classes after he was shot, he also was truant because school had no meaning to him. . . .His adolescent life was largely propelled by seeking rewards and responding to friends from the neighborhood. . . .The general function of the executive center to make good judgments was clearly deficient: he often drove a car at fourteen or fifteen; Mr. Sheppard was recovering from surgery at age fifteen and as he was driving his girlfriend, she lit a joint and it led to a serious car accident. This showed poor judgment and an inability to control impulses. . . .The story of Mr. Sheppard's youth and childhood is the combination of the usual impulsiveness, an immature brain, the risky behaviors that come with substance use, and his ADD. These three made his lack of planning, judgment and impulse control particularly dangerous and particularly noteworthy.

Id. at pp. 3-5.

In Graham, the Court stated:

Roper established that because juveniles have lessened culpability they are less deserving of the most severe punishments. 543 U.S. at 569, 125 S.Ct. 1183. As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility'"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'"; and their characters are "not well formed." Id. at 569-570, 125 S.Ct. 1183. . . .As petitioner's amici point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence.

Id. at 68. The Court finds that Bryan's background and mental and emotional development – his recklessness, immaturity and impetuosity - are all factors which weigh in favor of imposing a reduced sentence.

15

### 4. Susceptibility to Influence and Psychological Damage

Dr. Hutchinson described in her report that during the winter and spring of 1986, Bryan Sheppard suffered three severe tragedies when he was a freshman in high school.

> Mr. Sheppard was shot by an emotionally impulsive girlfriend in February; he was in a serious car wreck in March in which his front teeth were knocked out and his girlfriend suffered multiple broken bones of the face and ribs; and in May he found his grandfather moments after he suicided. No adult, and certainly not any teen, could emotionally process these three intense experiences without outside help and the passage of time. However, Mr. Sheppard had neither help nor time passage.

(Resentencing Ex. 8, p. 4).

Dr. Hutchinson stated that "[a]ny trauma that is too 'large' to process emotionally becomes stored in the amygdala- the seat of fight, flight or freeze." Id. Dr. Hutchinson also noted that shortly after these events, Bryan dropped out of school, and his mother's mental state deteriorated and her alcohol consumption increased following the suicide of her father.  Dr. Hutchinson observed that "[t]hese changes and their ramifications were never addressed. No one in the family received counseling or had the resources to emotionally support anyone else." Id.  With regard to susceptibility, Dr. Hutchinson noted that Bryan "spent almost all of his time with friends so peer pressure and proximity prompted actions that he might have otherwise controlled. He was known to never turn down a dare." Id. The Court finds that Bryan was susceptible to undue influence of friends and family members and that combined with the incidents of psychological damage that he suffered weigh in favor of a sentence of less than life without the possibility of parole.

### 5. Family & Home Environment

At the resentencing hearing, Bryan Sheppard's counsel presented a Life Chronology, which is a compilation of interviews with different individuals. Bryan Sheppard's mother, Virginia Sheppard, stated in an interview, "My kids were not raised in the best environment. They saw Jack (Bryan's father) and me drinking and fighting (weekends). Jack's parents got into fights. My parents fought too." (Life Chronology, Ex. 7, p. 7). Bryan stated in an interview that his mother had a marijuana plant behind their house and that she let him smoke it when he was very young. Id. at p. 11. Alcoholism was also an issue in the family. Bryan's sister, Glynis Hower, stated in an interview that her mother started drinking daily after her dad committed suicide in 1986 and that her father also drank daily. Glynis stated that "[c]ops were called every placed we lived." Her parents would drink and then fight. Id. at p. 14. In the sixth grade, Bryan reports that he was already "drinking and drugging." Id. at p. 27. In seventh grade Bryan brought home a bad report card. After being disrespectful to his mother, his father beat him with a belt. Id. at p. 35. Bryan reported that "I was beaten regularly by my father." Id. at p. 36. At age fourteen, Bryan ran away from home. Id. at p. 40. Bryan's uncle "Skip" Sheppard on one occasion forced Bryan to take intravenous drugs. Id. at p. 41. Skip was also known to beat up his nephew. Id. at p. 45. Bryan's mother stated in an interview, "Bryan was 20 years younger than Frank and 9 years younger than Skip. Their reputation made it really hard on my kids, especially Bryan because they were always falling down drunk or doing drugs or getting beat up by Bryan's friends because they were stealing from them (Bryan's friends). If I could change one thing about the way I raised Bryan, I'd move out of this

17

neighborhood to an area where he was not around so much violence, stealing, fighting and Frank and Skip. His uncles were the worst." Id. at p. 58.

In Miller, the Court noted that one of the significant differences between children and adults is children "'are more vulnerable . . .to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings." Id. at 2464 (quoting Roper, 543 U.S. at 569, 125 S.Ct. 1183). The Court finds that Bryan's abusive and dysfunctional family and home environment and the use of alcohol and drugs at a young age are factors which also weigh in favor of a sentence of less than life in prison without the possibility of parole.

### 6. Extent of his participation/ How familial and peer pressure affected him

Although he was convicted, Bryan Sheppard has consistently maintained that he is innocent of the charges. Also of note is that several of the witnesses who testified against Bryan Sheppard at the trial have since recanted their testimony. Additionally, during the trial, the extent of the various defendants' participation, except for Darlene Edwards, was left largely undefined.

With regard to familial and peer pressure, Dr. Hutchinson stated:

Mr. Sheppard, like most youngsters, chose friends from his neighborhood and then from his school. Those children came from the same home life where domestic violence, alcohol addiction and physical punishment thrived and little regard for education was acknowledged. They shared the same use of substances as Mr. Sheppard: drinking beer regularly at age twelve, and used marijuana from the age of thirteen. Many were fathers before they were 18. Many had their drivers licenses suspended or had spent time in jail. They partied too much and drove too fast. . . . Although his mother and father attempted to control any contact Skip and Frank Sheppard had with their children, they could often be found two doors down at the Baker home or could not be avoided if young Bryan visited his grandparents' home. Family gatherings required them to be in the presence of these negative influencers. By 1998 when Bryan

18

was 17, Frank was out of work and drank every day and Skip was
collapsing under a cocaine addiction.

(Resentencing Ex. 8, pp. 5-6). When Bryan turned thirteen, he met David Baird who

was three years older.  Bryan hung out in David's basement with other kids where they

drank, smoked and partied on a regular basis. (Resentencing Ex. 7, p. 37). As the Court

discussed above, the lack of evidence regarding Bryan's participation in the crime, and

the negative way that familial and peer pressure affected  Bryan are factors which also

weigh in favor of a reduction in sentence.

### 7.  Potential for Rehabilitation and Capacity for Change

Dr. Lori Sexton stated in her report that while Bryan has been in prison, he has

built an "impressive rehabilitation record."  Dr. Sexton notes that while in prison, Bryan

has obtained his GED despite being illiterate when he entered prison.  Over the past

two decades, Dr. Sexton notes that Bryan has completed numerous programs including

the Native American Spirit Run and the Challenge Program, an intensive cognitive

behavioral therapy program. Dr. Sexton notes:

> Mr. Sheppard's demonstrated record of rehabilitation in prison is
> promising for his continued adjustment post-release. There are many well-
> documented barriers to prisoner reintegration, including the lasting stigma
> of a felony conviction, financial hardship, and the temptations of drugs and
> alcohol.  Luckily for Mr. Sheppard, there is also a wealth of empirical
> literature on the role that rehabilitation, stable housing and strong social
> support can play in successful prisoner reentry. In sum, the challenges
> that Mr. Sheppard will face in the community are many, but he is well
> prepared for them.

(Resentencing Ex. 5, pp. 6-7).  Dr. Sexton's conclusion is that "[b]ased on the

documents I have reviewed and the interviews I have conducted with Mr. Sheppard, it is

my expert opinion that Mr. Sheppard has proven extremely amenable to rehabilitation,

will continue to rehabilitate himself if released from prison, and poses minimal risk to the

community." Id. p. 8.  Mr. Sheppard's extraordinary rehabilitation efforts over the years that he has been incarcerated are another factor which weighs in favor of a reduction in sentence.

The Government at the Resentencing hearing discussed other cases from around the country where defendants have been resentenced pursuant to Miller. However, the Court finds these cases to be of limited assistance because even the Government admitted "[n]one parallel the facts of this case." (Government's Sentencing Memorandum, p. 16).

After consideration of all of the Miller factors discussed above, the evidence, testimony and arguments presented at the resentencing hearing and review of the voluminous materials presented by Sheppard's counsel, the Court finds that Bryan Sheppard should be sentenced to twenty years in prison.

**C. 18 U.S.C. §3553 Factors**

Pursuant to 18 U.S.C. §3553, the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

**1. Nature & Circumstances of Offense**

As noted above, the crime which Bryan Sheppard was convicted of – arson resulting in the deaths of six firefighters - was devastating.  However, it must also be acknowledged that the trial court found that the defendants did not intentionally with malice aforethought set the fire. This acknowledgment by the trial court allows this Court today to construct a sentence which although still lengthy, is more proportionate than the life without parole sentence originally imposed.

20

### 2. History & Characteristics of Defendant

As noted above, Bryan was raised in a dysfunctional home environment where alcohol, drugs, domestic violence and abuse were the norm. He was exposed to these elements at an early age and they continued throughout his teen years. He had attention deficit disorder and was placed in special education classes throughout his years in school, finally dropping out when he was in the tenth grade. The Court finds that these factors affected Bryan and contributed to his susceptibility to the influences of others. These factors also support a reduction in his sentence.

### 3. Reflect Seriousness of the Offense/Promote Respect for the Law & Provide Just Punishment

The Court finds that a sentence of twenty years is a significant sentence which reflects the seriousness of the crime, promotes respect for the law and provides just punishment.

### 4. Afford Adequate Deterrence & Protect the Public

A twenty year sentence is a lengthy sentence and will serve to deter others who may be tempted to commit arson without thinking about the possible consequences. Additionally, the court finds that this sentence is sufficiently long enough to protect the public, as Bryan Sheppard has productively utilized his time in prison to obtain his GED, complete several educational programs as well as a 500 hour cognitive-behavioral residential drug treatment program. Additionally, while he has been incarcerated, Bryan has incurred only ten minor disciplinary infractions.

### 5. Avoid Unwarranted Sentencing Disparity

Awarding a sentence of twenty years will not have any unwarranted sentencing disparities, because none of the other defendants were under the age of eighteen when the crime was committed. The co-defendant closest in age, Richard Brown, was slightly over the age of eighteen when the crimes were committed. However, as the Court observed in <u>Roper</u>:

> [d]rawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. . . .For the reasons we have discussed, however, a line must be drawn. . . .The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.

<u>Id</u>. at 574. Thus, because no other defendants were under the age of eighteen, the Court finds no disparities will result if Bryan Sheppard is sentenced to twenty years in prison.

## III. CONCLUSION

Accordingly, for the reasons stated above and pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Bryan E. Sheppard, is sentenced to twenty years on the 1-count Indictment. Upon release from imprisonment, the defendant shall be placed on supervised release for 5 years. Since the Court finds that the defendant does not have the ability to pay a fine, the fine is waived. It is further ordered that the defendant shall pay joint and several restitution in the amount of $536,000 to the Kansas City, Missouri Fire Department.

Date:  March 3, 2017                          **S/ FERNANDO J. GAITAN**, **JR.**
Kansas City, Missouri                         Fernando J. Gaitan, Jr.
                                              United States District Judge